Edward J. FINLEY, Plaintiff–
Counterclaim–Defendant,

v.

UNITED STATES of America,
Defendant–Counterclaim–
Plaintiff–Appellee,

v.

Floyd JOHNSON, Counterclaim–
Defendant–Appellant.

No. 95–3108.

United States Court of Appeals,
Tenth Circuit.

May 1, 1996.

Joseph E. McKinney (Arthur E. Palmer, with him on the briefs) of Goodell, Stratton, Edmonds & Palmer, L.L.P., Topeka, Kansas, for Counterclaim–Defendant–Appellant.

Roger E. Cole (Loretta C. Argrett, Assistant Attorney General, and Charles E. Brookhart, with him on the brief) of Department of Justice, Washington, D.C., for Defendant–Counterclaim–Plaintiff–Appellee.

Before BRORBY, BARRETT and MURPHY, Circuit Judges.

BRORBY, Circuit Judge.

This case arises out of the United States' claim under 26 U.S.C. § 6672 that Floyd Johnson was a responsible person who willfully failed to pay over payroll taxes and is therefore liable for "a penalty equal to the total amount of [the tax not paid over]"—the Internal Revenue Service's (the "IRS") so-called "100–Percent Penalty." 26 U.S.C. § 6672(a). Mr. Johnson appeals the district court's decision to set aside a jury verdict in his favor and grant the United States' motion for judgment as a matter of law under Fed. R.Civ.P. 50(b). We exercise jurisdiction under 28 U.S.C. § 1291 and affirm the district court.

## I. Procedural Background

Mr. Johnson and Edward Finley were officers, directors, and shareholders of a struggling corporation named Halsey–Tevis, Inc. ("Halsey–Tevis"). Mr. Johnson served as president and chairman of the board. Mr. Finley served as secretary-treasurer. In July 1991, the I.R.S. notified both men they were being "charged a penalty under [26 U.S.C. § ] 6672 ... for failure to pay trust fund taxes as a responsible person." In both cases, the assessment equaled $144,876.48 and was for social security and income taxes Halsey–Tevis withheld from employee wages for the third and fourth quarters of 1988. Mr. Johnson and Mr. Finley each submitted partial payments of the assessments and filed timely administrative claims for refund and abatement.

After the IRS rejected Mr. Finley's claim for refund and abatement, he filed suit in the district court against the United States. The United States counterclaimed against Mr. Finley and joined Mr. Johnson as an additional defendant on the counterclaim pursuant to Fed.R.Civ.P. 13(h) and 20(a), seeking the full amounts of the assessments plus statutory interest. The government then moved for summary judgment against Mr. Finley and Mr. Johnson. The district court granted in full the United States' motion for summary judgment against Mr. Finley, con-

cluding he was a responsible person who willfully failed to pay over payroll taxes. As for Mr. Johnson, the district court partially granted the government's motion. Though it concluded he was a responsible person and granted summary judgment on that issue, it also determined "a disputed issue of material fact exists with respect to whether [Mr.] Johnson acted willfully." The United States' claim against Mr. Johnson then proceeded to a jury trial on the sole issue of whether he acted willfully within the meaning of 26 U.S.C. § 6672. At the conclusion of the parties' cases, the jury found for Mr. Johnson by responding "YES" to the following special question:

> Has the plaintiff, Floyd Johnson, shown by a preponderance of the evidence that he did not willfully fail to pay over to the United States any of the taxes withheld from the wages of Halsey–Tevis, Inc.'s employees[?]

The United States moved for judgment as a matter of law under Fed.R.Civ.P. 50(b), asking the district court to set aside the jury verdict and enter judgment for the government. The court granted the motion, finding that when it extended to Mr. Johnson all reasonable evidentiary inferences it was "firmly convinced ... a reasonable jury could not have found that [Mr.] Johnson met his burden of proof." Mr. Johnson filed a timely notice of appeal to the district court's judgment as a matter of law. He did not appeal the district court's summary judgment that he was a responsible party; therefore, the only issue before this court relates to whether Mr. Johnson acted willfully within the meaning of 26 U.S.C. § 6672.

## II.  Standard of Review

■ When reviewing a district court's grant of a motion for judgment as a matter of law under Fed. R. Civ. P. 50(b), we apply the same standard as the district court; *i.e.,* we review de novo the district court decision. *Sheets v. Salt Lake County,* 45 F.3d 1383, 1387 (10th Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 74, 133 L.Ed.2d 34 (1995). Judgment as a matter of law is appropriate only when "a party has been fully heard on an issue and there is no legally sufficient eviden-

tiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). We read this language to mean a court may grant the motion "only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." *Q.E.R., Inc. v. Hickerson,* 880 F.2d 1178, 1180 (10th Cir.1989). Accordingly, we view the evidence in this case in favor of Mr. Johnson, extending to him the benefit of all reasonable inferences. *F.D.I.C. v. United Pacific Ins. Co.,* 20 F.3d 1070, 1079 (10th Cir.1994). If a reasonable jury, properly considering the applicable law, could have found on the evidence presented at trial that Mr. Johnson did not willfully fail to pay over payroll taxes, then we must reverse the district court.

## III.  Reasonably Inferred Facts

Extending to Mr. Johnson all reasonable evidentiary inferences, we find a jury could have determined the following facts.

Halsey–Tevis, a corporation involved in the interior construction business, failed to pay over to the United States taxes it withheld from employees' wages in the third and fourth quarters of 1988. During the relevant time period, Mr. Johnson was president and a member of the board of directors of Halsey–Tevis. He also owned approximately twenty-five per cent of the corporation's shares. As president, Mr. Johnson supervised the company's sales, bidding, and construction operations. He performed these functions from Halsey–Tevis's office in Topeka, Kansas. Mr. Finley was secretary-treasurer of Halsey–Tevis and, like Mr. Johnson, served on the board of directors. Mr. Finley worked in the company's Wichita, Kansas, office and was in charge of keeping the books, arranging for financing, and preparing financial statements. These duties included keeping track of payroll and paying bills. Save for a petty cash building account in Topeka, the main accounting functions of Halsey–Tevis were performed by Mr. Finley out of the Wichita office. The company maintained its general checking and payroll accounts at First National Bank in Wichita. First National Bank also provided Halsey–

Tevis a line of credit that allowed the company to borrow operating funds on the basis of its accounts receivable.

Mr. Johnson reviewed the quarterly financial reports prepared by Mr. Finley, but he had no training in reading financial statements and generally suffered from an inability to understand financial statements. Though Mr. Johnson was authorized to sign checks for Halsey–Tevis, he neither wrote nor signed any checks for the company in 1988.

Halsey–Tevis was not an especially successful corporation. Though it experienced profits for most years in the early 1980s, by the fourth quarter of 1986 it began having cash flow problems and was having trouble making timely withholding tax payments. By the end of the first quarter of 1988, a year in which the company took on some unprofitable jobs, Mr. Finley knew the company was losing money. By June 1988, the company had lost $100,000 and was delinquent in meeting its withholding tax obligations. Mr. Johnson knew the company was having "ups and downs" but was led to believe by Mr. Finley that Halsey–Tevis's financial situation was improving by July and August 1988. In fact, the third quarter of 1988 saw the company slide into insolvency (though the company did not file for protection under Title 11 until after the time period relevant to this dispute). During this quarter, Mr. Finley utilized his knowledge of the company's automated accounting system to hide from Mr. Johnson and Halsey–Tevis's other directors that he was not paying over withholding taxes. Essentially, he would cut checks for the withholding taxes but then hold on to checks and not negotiate them. Because of the way the company's automated accounting system worked, this practice allowed Mr. Finley to reduce the perceived amount owed on the payroll tax account without actually paying over the money. Even a person with financial training would have had difficulty discerning Halsey–Tevis was having trouble meeting its withholding responsibilities.

Mr. Johnson first learned of the delinquent payroll taxes in a telephone conversation he had with Mr. Finley "in the latter part of October" 1988. According to Mr. Johnson, he and Mr. Finley "were talking about something else and I asked him if the taxes had been paid and [he said] they had not." Mr. Johnson then told Mr. Finley, "They have to be paid." Mr. Finley responded that partial payments were coming in and made no indications to Mr. Johnson the withholding taxes would not be paid over. At this point, Mr. Johnson made no further inquiries and took no other action with respect to the unpaid withholding taxes. At approximately this same time—the end of October 1988—Mr. Finley was finishing his preparation of Halsey–Tevis's quarterly financial statement for the period ending September 30, 1988.

On Monday, November 7, 1988, Mr. Finley contacted Halsey–Tevis's banker at First National Bank and explained that the newly completed quarterly statement indicated Halsey–Tevis was in financial trouble. The banker, after reviewing the statement and realizing the "information ... was not good," called a meeting of Halsey–Tevis's officers for the next day, Tuesday, November 8. On Monday evening, Mr. Finley called Mr. Johnson in Topeka and told Mr. Johnson he needed to come to Wichita the next morning so they could meet with the bankers. On Tuesday morning, Mr. Johnson and another Halsey–Tevis officer named Brian McCann drove to Wichita and met Mr. Finley at his office, where they discussed the company's financial problems. It was at this meeting, on November 8, 1988, that Mr. Johnson learned the withholding tax delinquency, of which he originally became aware in late October 1988, had not been remedied.[1] After discussing the withholding tax delinquency and the company's other financial problems, the officers began considering ways they "could get the tax money together." Before their scheduled meeting at First National Bank that morning, Mr. Johnson, Mr. Finley, and Mr. McCann went to the local Small Business Administration (S.B.A.) office

---

1. Though the record is not entirely clear as to the date of this meeting, the parties agree it took place on November 8.

to try and secure a loan that would allow them to pay the withholding taxes. The S.B.A. told the officers they would have to go through a bank.

The three officers then went to First National Bank, where they met with John Long, the bank official in charge of Halsey–Tevis's accounts. The officers explained to Mr. Long that the company had unpaid withholding taxes, could not meet its payroll, and needed to set up some method by which it could continue paying for its operating expenses. Realizing Halsey–Tevis was in serious "financial straits," the bank froze the company's accounts so that, according to Mr. Johnson, "We couldn't get a penny." Thereafter, Halsey–Tevis could not pay any bills without prior approval from the bank.

On November 14, Mr. Johnson and Mr. Finley gathered about $105,000 in collections from various customers, brought the collections to the bank, and asked bank officials to apply the deposit to the withholding tax balance. The bank officials refused and instead applied the deposit to Halsey–Tevis's loan indebtedness, saying "we'll take care of the taxes later." At one point after the bank seized Halsey–Tevis's accounts, Mr. Johnson and Mr. Finley managed to apply a corporate federal income tax refund to the outstanding withholding taxes. Also, in January or February of 1989, Mr. Johnson and Mr. Finley received a state income tax refund from the State of Kansas and applied this money to the withholding tax delinquency.

Mr. Johnson does not dispute that during the time between when he first learned of the withholding delinquency in late October and when the bank took over Halsey–Tevis's accounts after the meeting on November 8, the company had unencumbered funds with which it could have made at least partial withholding payments. Nor does Mr. Johnson dispute that he did not "follow up" on the withholding tax delinquency before learning on November 8 that Mr. Finley had not paid the taxes. Finally, the evidence unequivocally indicates Mr. Johnson delivered $105,000 to the bank on November 14. This money could have been delivered directly to the Internal Revenue Service.

## IV. Discussion

■ The Internal Revenue Code requires employers to withhold federal social security and income taxes from their employees' wages as those wages are paid. 26 U.S.C. §§ 3102(a) & 3402(a); *Bowlen v. United States,* 956 F.2d 723, 726 (7th Cir.1992). Because the employer is only required to pay over the taxes quarterly, the accumulated withholdings are deemed to constitute a "special fund in trust for the United States." 26 U.S.C. § 7501(a); *Slodov v. United States,* 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978). Once the employer withholds taxes from an employee's wages, the withholdings are credited to the employee regardless of whether they are paid over to the government; therefore, "the IRS has recourse only against the employer for their payment." *Id.* One of the IRS's most effective tools for ensuring it receives withheld trust-fund taxes is 26 U.S.C. § 6672, which creates personal liability for persons within an employer's business who are responsible for collecting and paying over the withheld taxes but willfully fail to do so. Section 6672 in part provides:

(a) **General Rule.**—Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a).

■ Thus, § 6672 imposes liability on a person if: (1) the individual is a person responsible for collecting and paying over trust-fund taxes, and (2) the individual willfully failed to carry out these responsibilities. *Muck v. United States,* 3 F.3d 1378, 1380 (10th Cir.1993); *Hochstein v. United States,* 900 F.2d 543, 546 (2d Cir.1990). Once the IRS assesses a putatively responsible person with a penalty under § 6672, that person bears the burden of showing by a preponderance of the evidence either he was not a

responsible person or he did not act willfully. *Hochstein,* 900 F.2d at 546.

Mr. Johnson does not challenge the district court's judgment that he was responsible for collecting and paying over Halsey–Tevis's withholding taxes. Therefore, the only issue before us today is whether a reasonable jury could have concluded Mr. Johnson met his burden of showing he did not willfully fail in his duties.

■ Generally, a responsible person's failure to pay over withholding taxes may be described as willful under two theories. First, under what might be called a theory of actual knowledge or intent, a responsible person's conduct is willful if that person " 'acts or fails to act consciously and voluntarily and with knowledge or intent that as a result of his action· or inaction trust funds belonging to the government will not be paid over but will be used for other purposes.' " *Olsen v. United States,* 952 F.2d 236, 240 (8th Cir.1991) (quoting *Hartman v. United States,* 538 F.2d 1336, 1341 (8th Cir.1976)); *see also Burden v. United States,* 486 F.2d 302, 304 (10th Cir.1973) (" 'Willfully' [in § ] 6672 ... means a voluntary, conscious and intentional decision"), *cert. denied,* 416 U.S. 904, 94 S.Ct. 1608, 40 L.Ed.2d 109 (1974). Second, a responsible person can also act willfully if she "acts with a reckless disregard· of a known or obvious risk that trust funds may not be remitted to the government." *Mazo v. United States,* 591 F.2d 1151, 1154 (5th Cir.), *cert. denied,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979); *Denbo v. United States,* 988 F.2d 1029, 1033 (10th Cir.1993) (same); *see also Thomsen v. United States,* 887 F.2d 12, 17 (1st Cir.1989) (recognizing that "in the civil context 'willful conduct ... may ... indicate a reckless disregard for obvious or known risks' " (quoting *Monday v. United States,* 421 F.2d 1210, 1215 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970))).

■ With regard to the first theory, we find a reasonable jury easily could have concluded Mr. Johnson's conduct did not satisfy the actual knowledge or intent approach to willfulness. There is scant, if any, evidence Mr. Johnson acted "with knowledge or intent" that his action or inaction would result

in Halsey–Tevis not paying over withheld taxes. Succinctly stated, the operative facts in this case are as follows: (1) Mr. Johnson learned from Mr. Finley in the latter part of October 1988 that Halsey–Tevis had not paid over its withholding taxes; (2)·Mr. Johnson told Mr. Finley the taxes "have to be paid"; (3) At this point the corporation had access to funds that could have been used to make at least partial payments and Mr. Johnson had authority to sign company checks; (4) On the morning of November 8, 1988, Mr. Johnson learned his admonition to Mr. Finley had gone unheeded; (5) Shortly thereafter, Halsey–Tevis's bank took over the company's accounts, arranged for a system that would allow the company to continue operating under the financial control of the bank, and thwarted an effort by Mr. Johnson or Mr. Finley to pay $105,000 toward the delinquency.

Mr. Johnson does not dispute that once he learned of the delinquency in late October, he became "obligated to apply unencumbered corporate funds to pay the tax liabilit[y]." *Muck,* 3 F.3d at 1381; *see also Godfrey v. United States,* 748 F.2d 1568, 1578 (Fed.Cir. 1984) (requiring "actual notice of the current delinquency to establish an affirmative duty to act"). The question is whether his action or inaction on this obligation was accompanied by the scienter necessary to create liability. *Slodov,* 436 U.S. at 254, 98 S.Ct. at 1788–89 (§ 6672 does not impose "an absolute duty to 'pay over' " delinquent·withholdings and "was not intended·to impose liability without personal fault"). Neither Mr. Johnson's declaration the taxes "have to be paid" nor his failure to do or say much else over days prior to the bank's takeover of Halsey–Tevis's accounts bespeaks any intent or knowledge that trust-fund taxes would not be paid over. The United States contends Mr. Johnson had actual knowledge or intent as a matter of law because of three facts: (1) Mr. Johnson knew of the delinquency, (2) unencumbered funds were available, and (3) Mr. Johnson had authority to sign company checks. Though we are loath even to credit this contention with a response, we do so with hope that the argument will not resurface in future cases. Put simply, the govern-

ment's contention relieves the proper actual knowledge or intent analysis of its very heart: consideration of Mr. Johnson's intent or knowledge. The only inquiry into knowledge or intent offered by the government relates to whether Mr. Johnson knew of the delinquency. As we have already established, this knowledge merely obliged Mr. Johnson to see that unencumbered funds were used to satisfy the delinquency. The government's contention offers no consideration of whether Mr. Johnson's response to his obligation indicated an actual intent or knowledge on his part that the delinquency would not be satisfied.

Turning to the second theory of liability, we now consider whether a reasonable jury could have concluded Mr. Johnson's actions or inactions did not constitute "a reckless disregard of a known or obvious risk that trust funds may not be remitted to the government." *Denbo,* 988 F.2d at 1033 (citations and internal quotations marks omitted). The recklessness approach to § 6672's willfulness requirement has received fair attention from several circuits. *See, e.g., Denbo,* 988 F.2d at 1033–34; *Thomsen,* 887 F.2d at 17–20; *Mazo,* 591 F.2d at 1154–55. This attention often focuses on a question important to this case: Under what factual circumstances does a responsible person's conduct become reckless, and therefore willful, as a matter of law? Several "distinctive fact patterns" have emerged, each of which, according to some courts, "demonstrate willfulness as a matter of law." *Thomsen,* 887 F.2d at 18 (listing three separate circumstances and citing *I.R.S. v. Blais,* 612 F.Supp. 700, 710 (D.Mass. 1985)). The case before us implicates one of these fact patterns. As this circuit and others have held, "[a] responsible person's failure to investigate or to correct mismanagement after being notified that withholding taxes have not been paid satisfies the section 6672 willfulness requirement."[2] *Denbo,* 988 F.2d at 1033; *see also Taylor v. I.R.S.,* 69 F.3d 411, 417 (10th Cir.1995); *Thomsen,* 887 F.2d at 18–19 (1st Cir.1989); *George v. United States,* 819 F.2d 1008, 1011–12 (11th Cir. 1987); *Mazo,* 591 F.2d at 1154; *Kalb v. United States,* 505 F.2d 506, 511 (2d Cir.

1974), *cert. denied,* 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975). Though our recent § 6672 decisions recite this language with mantra-like regularity, we have never engaged much exploration of its origin or meaning.

The investigate-or-correct-mismanagement rule originated in *Kalb,* 505 F.2d at 511. As support for the rule, *Kalb* cited *United States v. Leuschner,* 336 F.2d 246 (9th Cir. 1964), in which the Ninth Circuit reversed a district court's conclusion that a responsible person had not acted willfully. In support of its decision in *Leuschner,* the Ninth Circuit asserted:

> Leuschner knew that Anders, on whom he relied, had failed to see that such taxes were paid and had preferred other creditors. Yet he did absolutely nothing so see that this did not happen again. He was Anders' superior in the company. He had a duty to see that the taxes were paid. He knew that the moneys were a trust fund for the United States, and were to be paid to it. He knew that Anders, to whom he looked to carry out that duty, had not done it. He could no longer, in good faith, look to Anders to do his duty for him. His complete failure to do anything to see that Anders, or he himself, performed that duty, is, we think, as a matter of law, a "voluntary, conscious and intentional" failure.

*Leuschner,* 336 F.2d at 248. In the case of Mr. Leuschner, after he received notice that his financial officer was not paying over the withholding taxes, he allowed business to continue as usual until the IRS levied on the company's bank account. During this interval: "He did not instruct Anders to see that the withheld taxes were paid, or that other creditors were not preferred. He made no inquiries as to whether the taxes were being paid currently." *Id.* at 247.

In *Kalb,* the Second Circuit reduced the facts and reasoning of *Leuschner* down to the now familiar rule: "Willful conduct ... includes failure to investigate or to correct mismanagement after having notice that withholding taxes have not been remitted to

---

**2.** The jury was properly instructed on this theory of willfulness.

the Government." *Kalb,* 505 F.2d at 511 (citing *Leuschner,* 336 F.2d 246).

Since its articulation in *Kalb,* the rule has become an integral part of § 6672 jurisprudence, and its meaning has been further refined. It is now clear the rule is not triggered unless the responsible person received actual notice withholding taxes were not being remitted. *Godfrey,* 748 F.2d at 1578; *see Denbo,* 988 F.2d at 1033 (emphasizing the responsible person was aware that withholding taxes were not being paid). After receiving actual notice, a responsible person takes on an affirmative obligation to act. *Godfrey,* 748 F.2d at 1578; *see Denbo,* 988 F.2d at 1034 (holding the responsible person must do something once he learns has not paid over withholding taxes). The precedent contemplates two alternative ways by which a responsible person may satisfy this obligation. First, he can "investigate." Second, he can "correct the mismanagement." *E.g., Denbo,* 988 F.2d at 1033.

Obviously, difficult questions exist as to what conduct might satisfy these two alternatives; however, we need not delve far into such issues in this case. Mr. Johnson admits that when he received notice of the delinquency in late October 1988 he directed Mr. Finley to pay the taxes but "fail[ed] to make further inquiry" before the bank took over the Halsey–Tevis's accounts after the November 8 meeting. The law is clear that Mr. Johnson's conduct falls short of his obligation under § 6672; *i.e.,* it amounts to neither an investigation nor a correction of the mismanagement.

█ Once a responsible person becomes aware that withholding taxes have not been remitted, he may not fulfill his obligation to address the delinquency by delegating the task to someone who has already proven unreliable or untrustworthy.[3] *See Denbo,* 988 F.2d at 1031, 1033–34 (holding a responsible person cannot escape liability by relying on the assurances of a subordinate); *Thomsen,* 887 F.2d at 19; *Mazo,* 591 F.2d at 1157. As the First Circuit explained in *Thomsen:*

Once a "responsible person" has had clear notice that the person to whom he has delegated responsibility for paying the taxes has wrongfully failed to pay them in the past, he continues to delegate that responsibility only at his peril. Should the "responsible person" continue to delegate, without taking appropriate measures to assure that the delegated person will not repeat the dereliction in the future, the subsequent willfulness of the delegatee in once more failing to pay the taxes will be imputed to the "responsible person." . . . "If, after receiving actual notice, corporate officials could once again delegate their responsibility to subordinates, then repeated escape from liability would be possible and the government would be required to monitor corporate affairs daily."

*Thomsen,* 887 F.2d at 19 (quoting *Mazo,* 591 F.2d at 1157).

Mr. Johnson learned of Halsey–Tevis's withholding delinquency in the latter part of October 1988 when Mr. Finley admitted he had not been paying the taxes. At this time, the company had access to funds with which it could have made at least partial payments, and Mr. Johnson had authority to sign company checks. Our precedent makes clear Mr. Johnson thereafter took on a duty either "to investigate or to correct [the] mismanagement." *Denbo,* 988 F.2d at 1033. Mr. Johnson has produced no evidence he did either. Giving Mr. Johnson the most generous inferences, the most we can say is that his remark "They have to be paid" constituted an instruction to Mr. Finley to pay the taxes. The law is clear that Mr. Johnson's re-delegation of his duty to Mr. Finley, a subordinate who had already proven unreliable, did not satisfy his responsibility under § 6672. He continued "to delegate that responsibility only at his own peril." *Thomsen,* 887 F.2d at 19.

Though Mr. Johnson admits he took no action after directing Mr. Finley to pay over the taxes, he contends "his failure to make further inquiry between the October [conversation] and the early November date when company funds were fully encumbered was

---

**3.** To the extent *Leuschner* suggests liability may be avoided by instructing the subordinate to pay the taxes, *see Leuschner,* 336 F.2d at 247, it does not represent current law.

**974**

not unreasonable under the circumstances, and certainly not reckless conduct." In other words, Mr. Johnson argues that a responsible person's failure "to investigate or to correct mismanagement" should be excusable in cases where the responsible person's responsibility is cut off after a relatively short time interval. We need not address this contention as Mr. Johnson voluntarily turned over receipts to the bank rather than the Internal Revenue Service after the accounts were frozen on November 8.

By our reading of Mr. Johnson's argument, he asks us to hold that a responsible person's failure to investigate or to correct mismanagement upon actual notice of a withholding delinquency no longer constitutes recklessness as a matter of law. This holding would represent an overruling of prior Tenth Circuit precedent, a function that lies beyond the power of this tribunal. *United States v. Zapata*, 997 F.2d 751, 759 n. 6 (10th Cir.1993) ("one panel of this court cannot overrule [the decision of] another"). "We are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court." *In re Smith*, 10 F.3d 723, 724 (10th Cir.1993) *(per curiam), cert. denied,* —— U.S. ——, 115 S.Ct. 53, 130 L.Ed.2d 13 (1994). We are not oblivious to what one court has called "the Draconian enforcement power which the IRS has under the precedent," *Phillips v. I.R.S.,* 73 F.3d 939, 943 (9th Cir.1996), but it is our job to apply the law as it is.

For the reasons stated herein, the decision of the district court is **AFFIRMED.**